In the Matter of the Petition of FRANCIS H. GILBERT, Respond-
ent, to Prove the Last Will and Testament of HANNAH E.
TAYLOR, Late of the County of Kings, Deceased.

ELIZABETH CHANDLER and Others, Appellants.

Second Department, July 22, 1921.

Wills — testamentary capacity not shown — will executed through
undue influence — instructions — general instructions not applied
to facts of case insufficient — charge, though not excepted to,
constituted error in fact.

In proceedings to probate a will it appeared that the decedent, a colored
woman, was, at the time of the execution of the will, entirely paralyzed
upon her right side and was speechless and helpless, except for some minor
movement upon her left side; that after she was stricken with paralysis a
physician, a stranger to her, was called in and established communication
with her whereby if she wished to answer a question in the affirmative she
raised one finger of the left hand, blinked her eyes once and raised her left
knee, and if she desired to answer in the negative she raised two fingers of
her left hand, blinked her eyes twice and raised her knee twice; that the
physician immediately interested himself in the question of her making a
will; that the residuary legatee in the will, who was not a relative but who
had aided the testatrix in some litigation, procured the attendance of her
lawyer at her residence; that the lawyer and his assistant and the doctor,
after dismissing several friends of the testatrix from her room, proceeded
to ask the testatrix if she wished to make a will and if she desired to make
bequests to certain persons named, a list of whom had been furnished by
the residuary legatee; that by means of the signals prearranged by the
doctor information was secured from the testatrix and the will prepared
and executed; that the bulk of the testatrix's estate was left to the
residuary legatee.

Held, on all the evidence, that the finding that the testatrix possessed
testamentary capacity was against the weight of the evidence, at least in
this, that the evidence did not warrant a finding that she was able, unaided
by the suggestions of others, to recall the natural objects of her bounty or
that she was so aided;

That the finding, which the conclusion of due execution implied, that she
understood that the will cut off as beneficiaries certain institutions and her
stepdaughter, was against the weight of the evidence, in that the evidence
did not warrant the finding that she had them in mind;

That the finding that the will was not proven to have been executed
through undue influence was against the weight of the evidence, in that the
evidence indicated that the natural objects of her bounty were kept out of

her mind by the contrivance of the residuary legatee in preparing a list of possible beneficiaries.

The duty of a trial judge in instructing the jury is not discharged by simply giving to the jury an essay stating in language, however technically correct, the general principles of law without making any attempt to apply those principles to the facts of the particular case as the jury may find them proven.

The charge of the trial court was of the most general character and while it was not excepted to and, therefore, does not constitute error in law, it was so inept as to constitute substantial error in fact so as of itself to require a new trial.

APPEAL by Elizabeth Chandler and others from a decree of the Surrogate's Court of the county of Kings, entered in the office of said Surrogate's Court on the 18th day of November, 1920, admitting a certain paper writing to probate as the last will of Hannah E. Taylor, deceased,— said decree being based upon the verdict of a jury, which verdict answered in the affirmative two and in the negative the other of the three questions ordinarily submitted to a jury in such a contest, and also from an order, entered in said surrogate's office on the 10th day of November, 1920, denying appellants' motion to set aside the verdict and for a new trial made upon the minutes.

*Samuel F. Edmead,* for the appellants Elizabeth Chandler and Lottie Green.

*Francis P. Callahan,* special guardian for infant appellants.

*R. M. Cahoone* [*Frederick H. Chase* with him on the brief], for the respondent.

MILLS, J.:

The decedent, a colored woman, died in the borough of Brooklyn on July 10, 1919, at the age of over seventy years. Her exact age appears to have been unknown, but her apparent age was at least seventy. She left property, real and personal, of the value of about $30,000. She was a widow with no child or relative nearer than nieces. Apparently somewhat late in life she married a widower with one child, a daughter, with whom she seems not to have harmonized. The husband predeceased her on December 9, 1917. They had made mutual wills, and by his will she acquired his entire estate,

which I understand from the statements of counsel upon the argument constituted the bulk of her estate at her death.    The stepdaughter, evidently being grown and married, contested her father's will; but the contest resulted in the widow's favor, sustaining the will.    It ended only a few months before her death, and Mr. Chase, hereinafter referred to, was her attorney throughout it, as he also was in another law suit which she had with a third party at about the same time.    The paper propounded herein upon its face appears to have been executed on the 7th day of July, 1919, three days before her death.    She was stricken with paralysis the early morning of July fourth preceding, being entirely paralyzed upon her right side; and she so remained, speechless and helpless, until her death, except for some minor movements upon her left side.    The old family physician, Dr. Frederick M. Jacobs, a colored man, who had been the physician for her husband and earlier for some years the pastor of their church, was at once called in to attend her.    He found her utterly paralyzed as above stated, and in a semi-conscious condition, so that he could get from her no sign of recognition.    He saw her again on the fifth, and found her condition unimproved.    Then, being obliged to be absent for a few days, he requested Dr. McCoy to attend her in his absence, and she died before he returned.    It is not clear how Dr. Jacobs came to select Dr. McCoy, but there is nothing to indicate that Gilbert, hereinafter referred to, had anything to do with that.    McCoy had been for several years an alienist, but in general private practice for a few years.    Apparently, his selection to attend this woman was quite happy, at least from one point of view, for according to his testimony he very speedily solved the problem of communication with her, which her old physician had found insoluble.    The paper was signed, as witnesses, by Mr. Chase, Mr. O'Dougherty, a lawyer assistant in Chase's office, and Dr. McCoy.    All three were examined at length at the trial.    Their version was the following, taken by me chiefly from the testimony of the doctor, which was corroborated by the other two, except in the particulars hereinafter designated.

Dr. McCoy was an entire stranger to her, and visited her first about noon on July fifth.    He found her in bed and

paralyzed as above stated. Her condition then appeared to him to be hopeless. He proceeded forthwith to establish a system of communicating with her by directing her to answer his questions by raising one finger of the left hand, which she could move to some extent, for " yes," and two fingers for " no." Upon his first test she responded by raising the one finger, indicating that she understood. Then to make assurance doubly sure he instructed her to respond by doubling the signal, that is, not only raising the finger but by blinking her eyes once for the affirmative and twice for the negative. It may be pertinent to inquire why the double test, if the response to the first had been so prompt and complete. Having thus established his system of communication, the doctor, a perfect stranger to the woman and her affairs as he was, proceeded forthwith to ask her if she had made a will, and then, receiving from her the negative response by the raising of the two fingers and the double blinking of the eyes, he further asked, " Do you wish to make a will? " to which question she gave the instructed affirmative response. Here natural curiosity at least prompts the inquiry — what business of his was that? The only answer to this question is the doctor's statement that, when he arrived, one of the colored women with her told him that she had been going to make a will and had not made it. Who the woman was does not appear. At any event there is no suggestion that any request was made that the doctor, a perfect stranger, should precipitate himself as an actor into the matter. On the following day, at about noon, he returned and found her condition unchanged. At once he resumed the will question, but, apparently to make assurance trebly sure, he instructed her to add another sign to her response by lifting her left knee once for the affirmative and twice for the negative. Then he proceeded forthwith to put to her the same identical will questions which he had asked on the previous day, and he received from her the same responses, only they were given by the treble signs instead of the double ones. The doctor ends his testimony at that point with these laconic words, " That ended that visit." As to the next step in the *factum*, the doctor and Chase are somewhat at variance, and I proceed according to the latter's narrative. During the morning of the next day, July seventh,

Gilbert called Mr. Chase at his office upon the telephone, and told him that Dr. McCoy wanted him, Chase, to call him, the doctor, up; but somewhat strange to say Chase could not remember what Gilbert told him McCoy wanted to see him, the lawyer, for.   Here it may well be noted that Chase and McCoy had had no previous acquaintance.   Chase says that, having called McCoy up, he told him that Gilbert had asked him to do so, and that he, Chase, asked the doctor what he wanted; whereas the doctor says that Chase merely asked him if Mrs. Taylor was capable of making a will.   The important point here is that it is plain that Gilbert was the prime mover in producing the *factum* of the will.   At any rate Chase, with his assistant, about noon went to the doctor's office, and with him proceeded to Mrs. Taylor's house.   There they met Gilbert outside, evidently waiting for them.   They found in her bedroom some ten or twelve colored women and one or two colored men, evidently her old church friends, for she had been quite prominent and even an officer in the colored church.   The three lost no time, but started in at once by ordering the entire company from the room, and for a wonder went so far in the effort to secure entire secrecy as to disconnect the telephone.   Why all this, it may here be asked. It would seem, at least at first impression, that the aged woman in her half moribund condition needed, if ever, the aid and the presence of at least some of her old and trusted friends. Chase's explanation for that proceeding is that he wanted to secure against the possibility of any undue influence.   Tastes differ, and I would have thought that the procedure taken was the very one likely to invite that charge.   Then the doctor, with his previously designed and instructed tests, proceeded to ascertain if she knew Chase and his assistant; and to each inquiry she responded by giving the three-fold affirmative signal.   Then he proceeded for the third time to put to her his two stereotyped will questions — had she made a will, and did she wish to make one — and received from her the double three-fold response to the first inquiry, and the single like response to the second.   Then came the difficulty, and that was to ascertain her testamentary intentions; and somehow the three who were alone with her hit upon this method, namely, to procure from Gilbert a list of possible

or probable beneficiaries, and then to ask her as to each one,
" Do you want to give him or her [naming] anything? " and
if·by the accepted signs she said " Yes," then to ask her how
much by beginning with the suggestion of $100 and asking
her in succession for each ascending $100 until she responded
in the negative.   Accordingly, Chase called Gilbert up into
the hall outside the room, and got such a list from him.   No
effort was made to ask for any suggestion in that line or at
all from any of the other numerous company of friends who
had been ordered below.   Here it may well be noted that
Chase had been Gilbert's attorney for many years, and Chase
had discussed with him and Mrs. Taylor the proposition of
the will some time before.   Thus equipped the three still
alone with the woman resumed the task of will making.   From
the list so furnished by Gilbert they put to her as to each one
named therein the question, " Do you wish to give to him
or her [naming] anything? "   To most of those named she
gave the negative reply by the double treble signs; but as to
three she gave the affirmative response by the single treble
signs, although as to one of them, Mrs. Burch, she first gave
the negative but later the affirmative.   As to the three, she
indicated by her repeated such responses the hundreds as
follows:   Mrs. Walker $300, Mrs. Mattocks $500, and Mrs.
Burch $400, or $1,200 in all.   Then the following question
was put to her plump and square by Chase:   " Do you wish
the remainder of your estate to be left to Mr. Gilbert? "
and she answered by raising the one finger, blinking the eyes
once, and by raising the left knee.   Then the assistant, having
heard and seen it all, at once wrote out the will accordingly.
Chase then read it over to her and asked her if it was all
right, or if it was her last will and testament; and if she wanted
the three to sign as witnesses, to all of which inquiries she
separately replied by giving the affirmative signals; and then
the doctor took her left hand in his own and with it made
the cross, and the witnesses signed, and the action was com-
plete and the will made, provided we so determine.   I have
taken pains to go over the various acts imputed to her at
that time by the narrative, and find that she then in the
course of the making of the will raised her finger 44 times,
and blinked her eyes and raised her left knee each the same

App. Div. 865]        Second Department, July, 1921.

number of times, making 132 different movements of parts of her body. Mr. Chase testified that some few days before, two or three weeks, she had talked with him in the presence of Gilbert about making her will; and in a different part of his testimony he said that she then told him that she intended to make Gilbert her residuary legatee, and did not intend to give her relatives anything.

It was proven by her old pastor and physician, and by others of her old friends, that she had told them that she intended to leave in her will bequests to the church of which she had long been an official and evidently a devout member, and also to the Old Folks Home, the Home for the Colored Aged, and the Young Women's Christian Association. In the making of the will no inquiry was addressed to her to ascertain if she wanted to leave anything to any of those institutions, nor were they at all called to her attention. While she had had the contest with her husband's daughter over his will, she had afterwards told several of her friends that she still meant to leave something to the daughter in her will, as her husband had wished her to do so. The daughter was in no way called to her attention during the making of the will. Evidently Gilbert's list did not contain the name of the daughter or of any of those institutions. It is perhaps a significant fact that Mr. Chase threw away or destroyed the list which Gilbert gave him. Gilbert was no relation of Mrs. Taylor, but was a cousin by marriage of one of her grand-nieces; but he had aided her in her litigations.

It will, I think, be conceded by any one that the case, even as thus presented for the proponent, was a most remarkable one — at least in all my experience at the bar and upon the bench I have never read of anything like it outside of fiction. The only precedent for such will making which has come to my attention is an incident given in Dumas' novel entitled "The Count of Monte Cristo," volume 2, chapter 59. In that, however, the notary conducting the proceeding first applied to the paralytic the test as to knowledge of property, and even required the evidences of property to be produced, and also there the making was by a single sign, the movement of the eyelids; whereas here the doctor and the lawyer presiding made no such test, and required from the semi-conscious

woman three successive bodily signals for each testamentary act therein, perhaps illustrating the truth of the maxim, " Truth is stranger than fiction." Here again we may inquire why the super-caution of the three signals.

For the contestants there was evidence, given by the former doctor, Jacobs, and by other old friends who visited her each day from the fourth to the tenth inclusive, that she was practically unconscious, unable to recognize them; and several of the old friends testified to her previous declarations of the said other testamentary intentions.

In that situation of the case it is plain that the jury needed to have in the charge. not only a clear statement of the general rules established for determining the *factum* of a will, but also at least a precise and definite statement of the particular issues presented by the evidence in this particular and extraordinary case. A careful perusal of the charge reveals that, while it stated quite correctly those general rules, it made no reference whatever to the facts of this case. It dealt entirely with generalities and would be just as applicable to any other will contest as to this particular one. Thus, in instructing the jury as to testing her intelligence, that is, her state of mind when she made the will, the charge said that they might regard her " speech and conduct " at the time, as no doubt the learned surrogate had found it stated in several and perhaps many reported opinions of the highest court; although in this particular case all the evidence agreed that the testatrix was absolutely speechless. Later the reference to speech as a material factor was repeated.

The charge also was quite unsatisfactory in its dealing with the expert medical testimony. Its final summary upon that topic was, " If the question [meaning the hypothetical one] omitted to assume as true any fact which you shall find to have had existed in the person of the decedent and which you shall believe to have been a condition or symptom material to your conclusion as to her testamentary capacity when she signed the will, it will be your duty to disregard the physician's answer to that question; " but no attempt was made to point out to the jury what " conditions or symptoms " they should regard as material. Indeed they were instructed to disregard entirely such testimony if the hypothetical question which

elicited it omitted any single fact which they believed to be material. It was left to them to conjecture for themselves what proven fact was material. However, no exception was taken to any part of the charge, and no request clarifying or otherwise was made.

The charge properly defined the three well-known and established elements of testamentary capacity, viz., (a) intelligence or ability to keep in mind the property one has to dispose of; (b) ability to know or recall one's relations to the natural objects of one's bounty, that is, their natural claims upon him; and (c) the effect of the testamentary dispositions being made, for example that they will give the property thus and so to those specified, and incidentally cut off those not specified.

As to the issue of undue influence, the charge also was correct in its general terms, both as to the burden of proof being upon the contestants and as to the general fact necessary to be established in order to prove the allegation, and even that the proof may be entirely circumstantial; but it utterly failed in any way to discuss the facts in evidence bearing upon that problem. For instance, it in no way referred to the significant fact of Gilbert's own participation in the *factum* of the will.

Aside from the general extraordinary situation respecting the making of this alleged will; four things appear to me to be notable. The *first* is that there was no attempt whatever made to test Mrs. Taylor's intelligence as to the first of the specifications above stated, viz., her knowledge of her property even generally. The *second* is that several of the natural beneficiaries according to her often declared intentions, namely, the church and the other mentioned institutions and her husband's daughter, were not in any way suggested to her. Estranged as she evidently was from her own relatives, who were all quite distant in degree, or slightly regardful of them so that, by the appropriate signs, she declared that she did not wish to give anything to any of them, nothing could have been more natural than that she should wish to give something to the church to which she was, after the manner of her race, greatly devoted and of which she and her husband before her had been officials, and that she should wish to give something

Second Department, July, 1921.    [Vol. 197

to her husband's daughter in accordance with his request to her, yet in no manner was either brought to her attention, when all three persons present recognized that the only possible method of testing her state of mind was by specific suggestion. In the fiction case above referred to, each natural object of the testator's bounty was, at the very making of the will, specifically called to his attention; and, indeed, each such person was permitted to be present and in person to urge upon him his claims to his bounty. Possibly if that precedent had been fully followed in this case, this appeal might be free from the difficulties which we realize in dealing with it. In the *third* place, after very brief mention of other possible beneficiaries, Gilbert's name was suggested by Chase with this reminder, " As you stated to me in my office," namely, " Do you wish to make Mr. Gilbert your residuary legatee as you have stated — as you stated to me in my office? " As to him there was no testing by the successive hundreds as was the procedure with each of the others named; but at once the suggestion was made of the whole for him, viz.: " Do you wish to make Mr. Gilbert your residuary legatee? " The *fourth* and last is that neither Chase nor Gilbert, the active agents in the matter, both of whom, or at least Gilbert, must have known well the general situation, consulted any one of the dozen or more of Mrs. Taylor's old friends, who were in the house, as to any other possible or probable beneficiaries to be suggested to her. Mrs. Moore and Mrs. Waddell, her intimates for many years in church affiliations and otherwise, were both below in the house, and had each had from her lips declarations of her other such testamentary intentions. Doubtless if either had been consulted she would have suggested those institutions and the stepdaughter.

I find myself, therefore, compelled to conclude that the finding that she possessed testamentary capacity was against the weight of the evidence, at least in this, that the evidence did not warrant a finding that she was able, unaided by the suggestions of others, to recall the natural objects of her bounty, or that she was so aided. In other words, the weight of the evidence indicates that the suggestions made did not serve to recall to her mind those objects fully and fairly.

I further conclude that the finding, which the conclusion of due execution implied, that she understood that the will cut off as beneficiaries those institutions and her stepdaughter, was against the weight of the evidence, in that the evidence did not warrant the finding that she had them in mind.

I also conclude that the finding that the will was not proven to have been executed through undue influence was against the weight of the evidence, in that the evidence indicated that those natural objects of her bounty were kept out of her mind by the contrivance of Gilbert in preparing his list. Undue influence may be established by circumstantial proof, and to my mind the circumstances proven point unerringly to intentional suppression upon his part. He had aided her in her litigations, and in all reasonable probability knew well all her testamentary intentions as to those institutions and her stepdaughter. Certainly he had the means at immediate hand for ascertaining those intentions from her friends present in the house. That he made no effort to do so is evident from the fact that the entire business of the list was concluded between Chase and him in the hall outside the door of Mrs. Taylor's room at one meeting.

It would be a plain miscarriage of justice if a will secured from a dying person in such manner should be sustained. Moreover, at the trial had the jury were utterly unaided by the charge in dealing with the most extraordinary facts presented by the proofs, and they could have gained from it no idea of their true import or weight as affecting the issues involved. At a jury trial the duty of the judge is not at all discharged by simply giving to the jury an essay stating in language however technically correct the general principles of the kind of action being tried, such as contract, conversion, personal injury, or what not, without making the least attempt to apply those principles to the facts of the particular case as the jury may find them proven. Such a charge can serve only to confuse a jury, or at the best to make their verdict dependent upon the chance of their sense of natural justice in the case. The charge here was of that most general character. It was not excepted to, and, therefore, does not constitute error in law; but it was so inept as, in my judgment at least, to constitute substantial error in fact so as of itself

to require a new trial. What was recently said upon this point by the Court of Appeals in *People* v. *Odell* (230 N. Y. 481, 488, 494) is equally applicable here, viz.: "The trial judge should not as a rule limit himself to stating good· set terms of law culled from the codes and the reports. Jurors need not legal definitions merely. They require proper instructions as to ·the method of applying such definitions after reaching their conclusions on the facts " (p. 488); and " The charge is intended to aid a jury of laymen in the decision of the material issues of a case. It is to point out what are the kind of facts, among a great number before them, some material and some immaterial, that bear upon these issues. It is to assist them in reaching a just result, to aid in securing a fair and impartial trial. None of these objects is attained by a mere statement of legal definitions. Some idea, at least, must be given of their bearing upon· the concrete case at issue." (p. 494).

Therefore, I advise that the decree appealed from be reversed, and a new trial ordered, with costs to abide the event.

BLACKMAR, P. J., RICH, KELLY and MANNING, JJ., concur.

Decree of the Surrogate's Court of Kings county reversed, and a new trial ordered in said court, with costs to abide the event.